**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**BRIAN TANGORRE,**

                                                    **Plaintiff,**

          **vs.**                                                          **1:24-CV-388**
                                                                            **(MAD/CFH)**

**[VICTIM],**

                                                    **Defendant.**

_____

**APPEARANCES:**                          **OF COUNSEL:**

**HODGSON, RUSS LAW FIRM**          **CHRISTIAN J. SOLLER, ESQ.**
677 Broadway – Suite 401
Albany, New York 12207
Attorneys for Plaintiff

**OFFICE OF THE UNITED**                  **JOHN D. HOGGAN, JR., AUSA**
**STATES ATTORNEY**                         **DAVID M. KATZ, AUSA**
James T. Foley U.S. Courthouse
445 Broadway, Room 218
Albany, New York 12207-2924
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff commenced this action in Albany County Supreme Court, alleging that Defendant defamed him when Defendant reported to military authorities that Plaintiff had sexually assaulted her and subsequently spoke about the incident to other members of the military. _See_ Dkt. No. 2-1. The case was removed to this Court pursuant to a Westfall Act certification. The United States now moves for substitution as the named Defendant in this case pursuant to the Westfall Act and to dismiss this case in its entirety. _See_ Dkt. No. 21.

For the reasons set forth below, the United States' motion is denied without prejudice.

## II. BACKGROUND

According to Plaintiff, from June 2015 through May 2022, Plaintiff and Defendant surreptitiously engaged in a consensual sexual affair while both were employed by the New York Army National Guard ("National Guard").  *See* Dkt. No. 2-1 at ¶¶ 2-4, 19, 21.  Plaintiff was married to another woman and was Defendant's superior.  *See id.* at ¶¶ 5, 56.  Defendant was likewise married to another man as of 2018.  *See id.* at ¶¶ 6, 15-16; Dkt. No. 2-2 at ¶¶ 4-5.

On May 18, 2022, Plaintiff and Defendant had sex in a room at the barracks at Fort Drum, New York, and then returned to their assigned rooms.  *See id.* at ¶¶ 21-22.  On May 21, 2022, following a verbal confrontation in front of coworkers from the National Guard, Plaintiff and Defendant were ordered to meet with one of their superiors, Sgt. Major Scott Calordino, to discuss their relationship.  *See id.* at ¶¶ 25-38.  Later that same day, Plaintiff was confronted by Major Jean Kratzer, who questioned Plaintiff regarding the nature of his fight with Defendant.  *See id.* at ¶ 45.  Not wanting to lie to a superior officer, Plaintiff admitted to having a relationship with Defendant, and further admitted to having sex with her on May 18, 2022, and that this was not their first sexual encounter.  *See id.* at ¶¶ 46-47.

On May 22, 2022, Plaintiff was advised by Major Kratzer that Defendant "officially claimed the Plaintiff had non-consensual sex with her and advised the Plaintiff to get an attorney." *Id.* at ¶ 53.  Following a formal investigation by the Army Criminal Investigations Division, no criminal charges were brought against Plaintiff.  *See id.* at ¶ 55; *see also* Dkt. No. 2-2 at ¶ 53.  Although the criminal investigation had concluded, Plaintiff was referred for potential disciplinary action, since it is against Army regulations for a superior to engage in sexual activity with a subordinate and for married individuals to engage in extra-marital sexual activity.  *See* Dkt. No. 2-2 at ¶ 54.  The Non-Judicial Punishment hearing was held in February 2023.  *See* Dkt. No.

2-18 at ¶ 7.  The written disposition was issued on June 1, 2023, which found Plaintiff guilty of "Cruelty to Subordinates" and "Failure to Obey General Order (Sexual Harassment)." Dkt. No. 2-17.  As a result, Plaintiff was demoted from the rank of Sgt. First Class (E7) to Staff Sgt. (E6). *See id.*; *see also* Dkt. No. 2-2 at ¶ 57.  Plaintiff retired from the military on June 30, 2023, with an Honorable Discharge.  *See id.*

In his complaint, Plaintiff alleges that Defendant defamed him on three instances, while off duty and outside the scope of her employment with the National Guard.  Plaintiff claims that on July 23, 2022, Defendant told Amanda Bard that Plaintiff raped her.  *See* Dkt. No. 2-1 at ¶ 64.  Specifically, Ms. Bard, who was and is a member of the National Guard, was attending a concert in Saratoga, New York, where she saw Defendant, who she knows through their joint service in the National Guard.  *See* Dkt. No. 2-19 at ¶¶ 1-4.  Ms. Bard claims Defendant told her that she had been "'going through things' and asked [her] if [she] had heard any rumors going around." *Id.* at ¶ 5.  When Ms. Bard responded that she was unaware of any rumors, Defendant then informed Ms. Bard that Plaintiff had "raped her in the barracks" in May and that Defendant indicated that "she had to report" Plaintiff.  *See id.* at ¶¶ 6-7.

The second alleged defamatory statement occurred on March 29, 2023, when Defendant told Kaitlan Backes that Plaintiff raped her and that "she had to go into therapy because of the rape." Dkt. No. 2-20 at ¶ 5.  Ms. Backes was a colleague of both Plaintiff and Defendant in the National Guard and the comment was made while Defendant and Ms. Backes were off duty and in a car together driving to Walmart in Palmyra, Pennsylvania.  *See id.* at ¶¶ 1-4.

The third alleged defamatory statement occurred on April 8, 2023, while a group of off-duty soldiers were playing cards in one of the barracks at Fort Indiantown Gap, Pennsylvania.  *See* Dkt. No. 2-21 at ¶ 3.  Fernando Aguilar recounted the following interaction that occurred at

some point during that evening: "When it was getting late some of our group left and three of us stayed, one of which was [Defendant]. I noticed her demeanor changed, and she looked sad. I asked her what was wrong as did one of the other soldiers. She told us a few details of the night she was assaulted, she said she had drinks with Tangorre but didn't say much else of the evening. However, she said the next day she had been raped. ... She then started to cry and left the room." *Id.* at ¶¶ 5-6.

### III. DISCUSSION

**A.    Applicable Law**

"When an employee of the federal government is sued for tortious conduct that happens on the job, the employee is generally entitled to absolute immunity from personal liability under the Federal Employees Liability Reform and Tort Compensation Act of 1988 (the 'Westfall Act')." *Carroll v. Trump*, 49 F.4th 759, 760 (2d Cir. 2022) (citing 28 U.S.C. § 2679(b)(1)). "But in order to claim this immunity, the employees must prove two things: (1) that they are qualifying government officials for purposes of the Westfall Act, and (2) that the tortious conduct they purportedly engaged in was within the scope of their employment. If these requirements are met, the United States is substituted for the employee as the sole defendant in the tort suit. And from there, the action proceeds against the United States in accordance with the rules set forth in the Federal Tort Claims Act ('FTCA')." *Id.* at 760-61 (citing 28 U.S.C. §§ 2679(d)(1), 1346(b)(1)).

In order for substitution to take place, the Westfall Act first "empowers the Attorney General to certify that the employee 'was acting within the scope of his office or employment at the time of the incident out of which the claim arose[.]'" *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995) (quoting 28 U.S.C. § 2679(d)(1)). "Upon certification, the employee is dismissed from the action and the United States is substituted as defendant." *Id.* "Although the

'certification constitutes prima facie evidence that the employee was acting within the scope of his employment,' ... the merits of the certification are judicially reviewable." *Carroll*, 49 F.4th at 765-66 (quotation and other citation omitted). "If the district court concludes that certification is appropriate, the individual employee has been appropriately dismissed from the tort action and the case proceeds against the United States in accordance with the FTCA." *Id.* at 766. "Conversely, if 'the District Court determines that the employee in fact, and not simply as alleged by the plaintiff, engaged in conduct beyond the scope of his employment,' ... the substitution motion must be denied, and the suit will proceed against the government employee in a personal capacity." *Id.* (quotation omitted).

However, even an "Attorney General's certification that a federal employee was acting within the scope of his employment ... does not conclusively establish as correct the substitution of the United States as defendant in place of the employee." *Lamagno*, 515 U.S. at 434. A court must conduct "a *de novo* review of a 28 U.S.C. § 2679(d) certification by the Attorney General (or his designee) if a plaintiff 'allege[s] with particularity facts relevant to the scope-of-employment issue.'" *United States v. Tomscha*, 150 Fed. Appx. 18, 19 (2d Cir. 2005) (quoting *McHugh v. Univ. of Vt.*, 966 F.2d 67, 74 (2d Cir. 1992), *abrogated on other grounds by Osborn v. Haley*, 549 U.S. 225 (2007)). "The court must view the tortious conduct in the light most favorable to plaintiff, but ... makes its own findings of fact with respect to the scope of the tortfeasor's employment and, in so doing, ... may rely on evidence outside the pleadings." *Bello v. United States*, 93 Fed. Appx. 288, 289-90 (2d Cir. 2004) (citing *McHugh*, 966 F.2d at 74-75); *accord Freitas v. Cooper*, No. 13 Civ. 4566, 2014 WL 494525, *2 (S.D.N.Y. Feb. 5, 2014). The court conducts this analysis according to "state law principles pertaining to when intentional torts

conduct falls within the scope of a party's employment." *Bello*, 93 Fed. Appx. at 289; *see also*

*Regnante v. Sec. & Exch. Officials*, 134 F. Supp. 3d 749, 768 (S.D.N.Y. 2015).

"Under New York law, an employee acts within the scope of his employment when [i]

'the employer is, or could be, exercising some control, directly or indirectly, over the employee's

activities,' and [ii] '[the employee] is doing something in furtherance of the duties he owes to his

employer.'" *Fountain v. Karim*, 838 F.3d 129, 135 (2d Cir. 2016) (quoting *Hamm v. United*

*States*, 483 F.3d 135, 138 (2d Cir. 2007)).  To determine whether an employee's tortious acts are

done in furtherance of the duties he owes to his employer, a court considers:

> [i] the time, place and occasion for the act; [ii] the history of the
> relationship between employer and employee as spelled out in
> actual practice; [iii] whether the act is one commonly done by such
> an employee; [iv] the extent [to which the act] depart[s] from
> normal methods of performance; and [v] whether the specific act
> was one that the employer could reasonably have anticipated.

*Fountain*, 838 F.3d at 138 (quoting *Riviello v. Waldron*, 47 N.Y.2d 297, 303 (1979)); *see also*

*Tomscha*, 150 Fed. Appx. at 19; *Bello*, 93 Fed. Appx. at 290.

"Under New York law, the mere fact that an employee is alleged to have engaged in an

intentional tort does not compel the conclusion that the employee was acting outside of the scope

of employment." *Griebsch v. Weaver*, No. 7:05-cv-958, 2005 WL 2260374, *3 (N.D.N.Y. Sept.

16, 2005) (citing *Sims v. Bergamo*, 3 N.Y.2d 531, 534-35 (1957)) (other citation omitted); *see*

*also Brancato v. Dee and Dee Purchasing*, 296 A.D.2d 518, 519 (2d Dep't 2003).  "[A]n

employee's tortious acts fall within the scope of his employment if 'done while the servant was

doing his master's work, no matter how irregularly, or with what disregard of instructions.'"

*Tomscha*, 150 Fed. Appx. at 19 (quoting *Riviello*, 47 N.Y.2d at 302); *accord Freitas v. Cooper*, No. 13-cv-4566, 2014 WL 494525, *2 (S.D.N.Y. Feb. 5, 2014).[1]

In Pennsylvania, courts apply the Restatement (Second) of Agency's Section 228 to determine whether conduct is within the scope of employment. *See Matsko v. United States*, 372 F.3d 556, 559 (3d Cir. 2004) (citing *Fitzgerald v. McCutcheon*, 270 Pa. Super. 102, 410 A.2d 1270, 1272 (1979)). "According to the Restatement, 'conduct is within the scope of employment if, but only if: (a) it is the kind [the employee] is employed to perform; (b) it occurs substantially within the authorized time and space limits [and] (c) it is actuated, at least in part, by a purpose to serve the master....'" *Brumfield v. Sanders*, 232 F.3d 376, 380 (3d Cir. 2000) (quotation omitted).

**B.     Application**

In its motion to substitute, the United States argues that the United States Attorney's certification was proper in this case "because Defendant acted within the scope of her employment as a [National Guard] member in making the statements underlying this case." Dkt.

---

[1] The United States and Plaintiff have both concluded without discussion that New York *respondeat superior* law applies to the present matter. The Court notes, however, that only one of the alleged defamatory statements occurred in New York, while the other two statements occurred in Pennsylvania. *See* Dkt. Nos. 2-19, 2-20 & 2-21. Since two of the alleged defamatory statements occurred in Pennsylvania, the *respondeat superior* law of Pennsylvania would presumably apply to the Court's analysis for those statements. *See Carroll v. Trump*, 66 F.4th 91, 93-94 (2d Cir. 2023) (applying District of Columbia law to determine whether the defendant was acting in the scope of his employment when he made allegedly defamatory statements while physically present in the District of Columbia); *Wilson v. Libby*, 535 F.3d 697, 711 (D.C. Cir. 2008) (holding that courts must apply the *respondeat superior* law "in the state in which the alleged tort occurred") (citation omitted); *Bowles v. United States*, 685 Fed. Appx. 21, 24 (2d Cir. 2017) ("Whether the employee was in fact acting within the scope of his or her employment for purposes of the Westfall Act is determined by reference to "principles of *respondeat superior* of the state in which the alleged tort occurred'") (quotation omitted); *Wuterich v. Murtha*, 562 F.3d 375, 383 (D.C. Cir. 2009) (concluding that District of Columbia *respondeat superior* law applied to alleged defamatory statements made while in the District of Columbia, but that Pennsylvania *respondeat superior* law applied to tortious conduct that occurred while in Pennsylvania). As such, in an abundance of caution, the Court will consider the claims under both New York and Pennsylvania law.

No. 21-1 at 10. Specifically, the United States contends that Defendant was engaged in Active Guard Reserve duty under 28 U.S.C. § 2671 when the sexual incident occurred, that it "occurred on base in barracks, Defendant's reporting of the sexual incident occurred on duty, and the alleged subsequent statements flowed from her reporting and occurred during her time as an Active Guard reserve member, which is akin to Active Duty status." *Id.* at 10-11. The United States further argues that, "in light of the military's compelling interests in both fostering good order and discipline, and maintaining battle readiness, the United States Attorney correctly certified that Defendant's subsequent statements to other team members were within the scope of her employment." *Id.* at 11. The United States also relies heavily on the fact that the Army "considers the elimination of sexual harassment and sexual assault in its rank critical defense imperative." *Id.* at 13-15. The United States contends that "victims of sexual assault and sexual harassment are not just encouraged to report sexual assault and sexual harassment, but also to discuss those matters freely with other National Guard members as a part of the culture of trust being fostered in the Army National Guard and as a part of initiatives aimed at preventing sexual harassment and sexual assault as well as suicides in the armed services." *Id.* at 13-14. As such, the United States asserts that Defendant's two statements to two separate female team members were not only foreseeable to the National Guard, but were encouraged, and that the third statement, "made in response to a question from another team member in the barracks, is an example of a different type of conduct encouraged by the Army National Guard." *Id.* at 14.

In response, Plaintiff contends that all three statements at issue were made by Defendant while off-duty or in a "nonoccupational setting," and that it is irrelevant that the "setting of the underlying encounters from which the defamation arises" occurred while on-duty. *See* Dkt. No. 24 at 20. Plaintiff argues that Defendant "falsely accused [him] of rape while off-duty at a rock

concert, card game and on a car ride to the grocery store in July 2022, March 2023, and April 2023, constituting defamation per se in New York." *Id.* Further, Plaintiff contends that "Defendant's argument that members of the National Guard are effectively always on duty is without merit and desperate, even." *Id.* Plaintiff notes that the Sexual Assault Prevention and Response ("SAPR") Policy of the New York State Military and Naval Affairs even contemplates off-duty occurrences of sexual assault and that service members who are subjected to sexual assault while off-duty are still entitled to receive services from the National Guard. *See id.* at 20-21. Plaintiff argues that Defendant's statements are entirely unrelated to any official responsibilities and that they were made "'solely for personal motives unrelated to the furtherance of the employer's business.'" *Id.* at 21 (quoting *Griebsch v. Weaver*, No. 7:05-cv-958, 2005 WL 2260374, *3 (N.D.N.Y. Sept. 16, 2005)).

In support of its motion, the United States relies on *Garcia v. Pizzolato*, No. 99-cv-898, 2000 WL 328818 (S.D.N.Y. Mar. 28, 2000). In that case, the plaintiff, an employee at the Veterans Affairs Medical Center ("VAMC"), alleged that the defendant, another VAMC employee, defamed him when she reported to the Equal Employment Opportunity ("EEO") office that the plaintiff had been sexually harassing her in the workplace. *See id.* at *1. The defendant first reported the conduct to an EEO officer, and then, allegedly at the EEO officer's suggestion, sought an order of protection from the local police. *See id.* The defendant's first complaint to the EEO office served as the basis for the plaintiff's defamation cause of action, while the second complaint to the local police served as the basis for the plaintiff's malicious prosecution cause of action. *See id.* The United States Attorney certified that the defendant's internal reporting was within the scope of her employment and therefore agreed to defend the first cause of action. *See id.* However, the United States Attorney refused to certify that the defendant was acting within

the scope of her employment when she sought the order of protection and, therefore, refused to defend her as to the malicious prosecution cause of action. *See id.*

Upon the defendant's motion, the district court ordered the United States to be substituted in her stead as to the malicious prosecution claim. *See id.* at *2. In its analysis, the court noted that, "[a]lthough [the defendant's] actions may have been motivated by personal reasons, she also claims that she acted at the direction of an EEO employee." *Id.* at *3. Therefore, the court reasoned that "her actions also benefitted the VAMC in that it helped to ensure the expeditious removal of a potentially dangerous person working at the VAMC and amongst its clients." *Id.*

Here, the facts are entirely distinguishable from *Garcia*. First, Plaintiff's complaint makes clear that he is not relying on Defendant's statements made to superior officers that formed the basis of the official investigation into Plaintiff. Rather, the alleged defamatory statements were those made to fellow service members, while off duty, seemingly outside of and unconnected to any official investigation. *See* Dkt. No. 2 at ¶¶ 64-67. The first allegedly defamatory statement occurred on July 23, 2022, when Defendant saw Amanda Bard at a concert in Saratoga, New York, and Defendant told Ms. Bard that Plaintiff had "raped her in the barracks." Dkt. No. 2-19 at ¶¶ 1-7. The second allegedly defamatory statement occurred on March 29, 2023, when, while driving to Walmart in Palmyra, Pennsylvania, Defendant told Kaitlan Backes that Plaintiff had raped her and that "she had to go into therapy because of the rape." Dkt. No. 2-20 at ¶¶ 1-5. The third allegedly defamatory statement occurred on April 8, 2023, when Defendant told Fernando Aguilar she had been raped while they were drinking and playing cards, off duty, while in one of the barracks at Fort Indiantown Gap, Pennsylvania. *See* Dkt. No. 2-21 at ¶¶ 1-6. Notably, none of these statements were made as part of the official investigation or at the direction of

Defendant's superior officers after she had made her initial complaint to Major Kratzer. Rather, each statement was made in an informal setting, while all parties were off duty.

Here, the statements at issue were made outside of the workplace, when Defendant was off duty, in social settings, and not pursuant to any official policy or established procedure. Moreover, unlike the defendant in *Garcia*, Defendant has not alleged that she engaged in this conduct at the instruction of a superior officer or that such conduct was done as part of the formal investigation. The facts before the Court demonstrate that under either New York or Pennsylvania law, Defendant was acting outside the scope of her employment when the alleged defamatory statements were made. *See Brumfield v. Sanders*, 232 F.3d 376, 380-81 (3d Cir. 2000) (finding that the federal employee defendants were acting within the scope of their employment when the alleged defamatory statements were made during the course of an official investigation). The Court finds that these statements were not made within the course of Defendant's employment under either New York or Pennsylvania law and, therefore, that certification under the Westfall Act was inappropriate.

The United States argues Defendant's conduct was in furtherance of the Army's interest in combating instances of sexual harassment and assault in the military. *See* Dkt. No. 21-1 at 13-14. Specifically, the United States contends that "victims of sexual assault and sexual harassment are not just encouraged to report sexual assault and sexual harassment, but also to discuss those matters freely with other National Guard members as part of the culture of trust being fostered in the Army National Guard and as part of initiatives aimed at preventing sexual harassment and sexual assault as well as suicides in the armed services." *Id.* "Thus, the Defendant's two statements to two separate female team members were not only foreseeable to the Army National

Guard, but in fact these types of discussions were encouraged by the Army National Guard."
*Id.* at 14.

While the National Guard may encourage its members to discuss such matters with other members, nothing in the record supports the conclusion that it encourages such discussions when the alleged sexual assault and/or harassment may not have actually occurred, as Plaintiff alleges here.  The United States does not contend that a soldier's false reports of misconduct, lodged solely to damage a fellow soldier's life and career, or to avoid punishment for the complaining soldier's own misconduct, nonetheless serve the Army's interests.  Yet the United States seemingly asks the Court to assume the veracity of Defendant's statements in its scope-of-employment analysis.  Under the relevant caselaw, this is something that the Court is not permitted to do.

From a procedural standpoint, this case is governed by the Supreme Court's decision in *Osborn v. Haley*, 549 U.S. 225 (2007).  In *Osborn*, the Court initially addressed an issue not raised in this case: whether the Attorney General can certify that a federal officer was acting within the scope of his employment when the officer denies the occurrence of the allegedly tortious conduct claimed by the plaintiff.  *See id.* at 230.  The Court held that certification can properly be based on the United States' understanding of the facts that differs from the plaintiff's allegations.  *See id.* at 231.  This is so because "the Attorney General's certification is the first, but not the final word on whether the federal officer is immune from suit and, correlatively, whether the United States is properly substituted as defendant." *Id.* at 246 (internal quotation marks omitted).  Continuing to address the question of the Attorney General's initial scope-of-employment certification, the Court further reasoned that "it would make scant sense to read the [Westfall] Act as leaving an employee charged with an intentional tort to fend for himself when

he denies wrongdoing and asserts he engaged only in proper behavior occurring wholly within the scope of his office or employment." *Id.* at 248 (footnote and internal quotation marks omitted).

Under *Osborn*, now that Plaintiff has challenged the scope-of-employment certification, the Court is not permitted to disregard evidence of fabrication as it related to Defendant's motivation and to rely solely on the United States' contrary understanding of those facts. *See id.* at 253 n.18. Rather, the Court must now undertake a "greater factfinding role ... [since] Westfall Act immunity is in dispute." *Id.* At this stage of the proceedings, "a district court is called upon to decide who the proper defendant is: the named federal employee, or the United States." *Id.* Thus, *Osborn* instructs that once a scope-of-employment certification is challenged, the district court must resolve factual disputes and cannot simply defer to the United States' understanding of the facts. *See id.* Moreover, in *Osborn* the Court recognized the possibility for overlap, mainly in cases alleging intentional torts, between the validity of the scope-of-employment certification and the merits of a plaintiff's claim, as well as the potential need for the district court to make credibility determinations. *See id.* at 251-52 & n.15.

Accordingly, at this stage, an evidentiary hearing is necessary to determine material fact issues in dispute regarding the scope of employment. *See Hockenberry*, 42 F.3d at 1174-75; *see also Kearns v. United States*, 23 F.4th 807, 812 (8th Cir. 2022); *Loehndorf v. United States*, No. 14-cv-106, 2014 WL 3752120, *6-8 (W.D. Wash. July 30, 2014) (determining whether the Westfall Act certification was proper following an evidentiary hearing to resolve material fact issues).

The facts of the present matter are remarkably similar to a case recently decided by the Tenth Circuit. In *Hockenberry v. United States*, 42 F.4th 1164 (10th Cir. 2022), Scott Hockenberry was a Captain in the United States Army and Michelle Kalas was an Army Reserve

Captain. *See Hockenberry*, 42 F.4th at 1167.  In 2016, Hockenberry and Kalas were employed as attorneys at Fort Still near Lawton, Oklahoma.  *See id.*  Beginning in May 2016, Hockenberry and Kalas became involved in a consensual sexual relationship.  *See id.*  In August 2016, however, Kalas made statements accusing Hockenberry of sexual assault and other misconduct to work colleagues, an officer with the Lawton Police Department, and a Sexual Assault Response Coordinator at Fort Still.  *See id.*  The Army brought formal charges of sexual and physical assault against Hockenberry under the Uniform Code of Military Justice, which were referred to a general court-martial.  *See id.* at 1167-68.  While the court-martial proceedings were pending against him, Hockenberry filed a complaint against Kalas in Oklahoma state court, alleging that she "made false and defamatory allegations against [him] for sexual assault to the Lawton Police Department, the Sexual Harassment and Assault Response and Prevention Office of the U.S. Army, the U.S. Army Criminal Investigation Command, Comanche County District Court, and other individuals, colleagues, and friends." *Id.* at 1168.

Thereafter, the United States Attorney for the Western District of Oklahoma certified under the Westfall Act that Kalas was an employee of the United States acting within the scope of her employment at the time of the alleged wrongful acts and then removed the action to federal court, substituted itself as the defendant in place of Kalas, and moved to dismiss the action for lack of subject matter jurisdiction, arguing that it has not waived sovereign immunity as to Hockenberry's claims under the FTCA.  *See id.*  Hockenberry then moved to challenge the United States' Westfall Act certification and its substitution as the defendant, arguing that Kalas's statements were not made within the scope of her employment because they were false and "were fabricated out of a vengeful and self-interested desire to destroy his life and career." *Id.*  The United States argued in opposition that, under Army Command Policy and the Army's rules of

professional conduct applicable to attorneys, Kalas was required to report to appropriate Army personnel a fellow soldier's sexual assault and other misconduct." *Id.* "It asserted that Army policy also recognizes that victims of sexual assault may confide in friends or family members before making an official report." *Id.* As to Kalas's report to the Lawton Police Department, the United States claimed that, under Army procedures, persons seeking a Military Protective Order ("MPO") are advised to also seek a civilian protective order. *See id.* In addition, once an MPO was issued against Hockenberry, the Army was required to notify appropriate civilian authorities because Kalas did not reside on the military installation and an MPO is not enforceable off base. *See id.*[2]

The district court denied Hockenberry's motion challenging the certification, finding that Kalas was acting within the scope of her employment as defined by Oklahoma's *respondeat superior* law. *See id.* at 1169. The court rejected as flawed Hockenberry's premise that Kalas acted outside the scope of her employment by fabricating sexual assault allegations to harm his career. *See id.* "It concluded that, under Oklahoma law, an employer may be held responsible for its employee's torts, even if the employee 'willfully or maliciously committed the wrongs' or 'was acting within the scope of authority to do the particular thing rightfully that was subsequently done in a wrongful manner.'" *Id.* (quotation omitted). While acknowledging some evidence of Kalas's malice in the record, the district court found that her improper motivation was not the sole moving force behind her reporting; rather, the court concluded she was motivated at least in part by her employment duties and obligations. *See id.* The district court further held that Hockenberry failed to present specific evidence contradicting the Westfall Act certification with

---

[2] While Hockenberry's motion was pending in the district court, the court-martial proceedings against him concluded with a verdict of acquittal on all charges and specifications against him. *See Hockenberry*, 42 F.4th at 1069-70.

respect to Kalas's statements to friends and colleagues because his complaint did not provide sufficient detail regarding such statements and he did not explain how the court should consider the statements in light of the friends' and colleagues' roles in the Army's investigation of Hockenberry. *See id.*

On appeal, the Tenth Circuit held that the district court erred in deciding the Westfall Act scope-of-employment issue as a matter of law without first conducting an evidentiary hearing to decide disputed questions of fact, including whether Kalas's allegations of sexual assault were fabricated. Applying Oklahoma law,[3] the court held that the district court erred in concluding that it could decide the scope-of-employment issue as a matter of law "on the ground that only one reasonable conclusion as to Kalas's motivation could be drawn from the facts." *Id.* at 1172. "If Kalas fabricated her reports of misconduct, a reasonable conclusion could be drawn that she was wholly motivated by an external, personal purpose and therefore acted outside the scope of her employment in making the statements." *Id.* at 1172-73 (citations omitted). As such, the Tenth Circuit remanded the case to the district court with instructions to conduct an evidentiary hearing

---

[3] "Under Oklahoma law, '*respondeat superior* liability is normally a question of fact to be determined ... from all the surrounding circumstances.'" *Hockenberry*, 42 F.4th at 1171 (quotation omitted). "'[I]n general terms it may be said that an act is within the course of employment if (1) it be something fairly and naturally incident to the business, and if (2) it be done while the servant was engaged upon the master's business and be done, although mistakenly or ill advisedly, with a view to further the master's interest, or from some impulse of emotion which naturally grew out of or was incident to the attempt to perform the master's business, and did not arise wholly from some external, independent, and personal motive on the part of the servant to do the act upon his own account.'" *Id.* (quotation omitted). "Thus, a fact-finder 'must decide if [the employee's] acts were so far removed from any work-related endeavor and geared, instead, toward a personal course of conduct unrelated to her work so that it would no longer be appropriate to hold her employer responsible for her act(s).'" *Id.* (quotation and other citation omitted). "'Therefore, the purpose or motivation behind [the employee's] act(s) is an important, and potentially an overriding, consideration permeating resolution of arriving at a correct answer to the *respondeat superior* question.'" *Id.* (quotation omitted).

which would necessarily require the district court to make credibility determinations regarding whether the allegations of sexual assault were fabricated.  *See id.* at 1174-75.

Here, unlike *Hockenberry*, all of the statements at issue were made by Defendant to fellow service members, outside of any official investigation or through an official report.  Rather, the statements were made after Defendant had already reported the alleged conduct through the appropriate channels, and were made in the following months to fellow service members while off-duty and while in social settings.  Moreover, Plaintiff has plausibly alleged and provided evidence to support his claim that Defendant's conduct was personally motivated for either malicious reasons or in an effort to avoid punishment once it had been discovered that she had been engaged in an affair that was prohibited by Army regulations.  Courts applying New York and Pennsylvania law have regularly found that both intentional and unintentional torts may be outside the scope-of-employment when the conduct at issue was based on the personal motivations of the defendant.  *Doe v. Hilton Cent. Sch. Dist.*, ___ F. Supp. 3d ___, 2024 WL 3493606, *8-9 (W.D.N.Y. 2024) (holding that personal motivation a factor to consider when determining *respondeat superior* liability) (citations omitted); *Agyin v. Razmzan*, 986 F.3d 168, 185 (2d Cir. 2021) (holding that, to act within the scope of their employment, an employee need only act "in part to benefit the employer") (citation omitted); *Sharkey v. Lasmo (AUL Ltd.)*, 992 F. Supp. 321, 329 (S.D.N.Y. 1998) (holding that "[t]he cases do however suggest that in order to be within the scope of employment, the tort must have been committed in part to benefit the employer and the employer must have received some benefit"); *A.W. by E.W. v. N.Y. Dep't of Educ.*, 702 F. Supp. 3d 46, 53 (E.D.N.Y. 2023) (holding that, "even where personal motives are involved, it is 'well established that intentional torts may still fall within the scope of employment, and the motivation for such conduct ... is but one of several for [the court's] consideration

pertaining to whether acts were foreseeable as a natural incident of the employment'") (quoting *M.K. v. State*, 216 A.D.3d 139, 143 (3d Dep't 2023)); *Wuterich v. Murtha*, 562 F.3d 375, 385 (D.C. Cir. 2009) (noting that the motivation of the employee for engaging in the conduct is relevant to determining scope-of-employment under Pennsylvania law). In light of the relevance of the employee's motivation under both New York and Pennsylvania *respondeat superior* law and the disputed fact issues apparent from the record, the Court is unable to determine as a matter of law at this time whether the Westfall Act certification was proper or if it should be stricken. *See Hockenberry*, 42 F.4th at 1174-75.

Considering all of the evidence in the record and the allegations in the complaint, the Court finds that questions of fact exist precluding the Court from granting the United States' motion. Plaintiff has carried his initial burden of rebutting the fact that the scope-of-employment certification is *prima facie* evidence that Defendant's conduct was within the scope of her employment, both through the complaint and exhibits attached thereto, and through his response to the United States' motion.

Accordingly, the United States' motion to substitute and to dismiss Plaintiff's complaint is denied without prejudice, subject to renewal following an evidentiary hearing.[4]

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, the Court hereby

---

[4] The parties may request to conduct limited discovery prior to the evidentiary hearing. This discovery shall be limited to issues related to the scope-of-employment determination. Such issues shall include, for example, whether Defendant fabricated the alleged sexual assault (and any motivation for such fabrication), and the precise circumstances surrounding the three statements at issue.

**ORDERS** that the United States' motion to substitute into this case and to dismiss Plaintiff's complaint (Dkt. No. 21) is **DENIED** without prejudice, subject to renewal following an evidentiary hearing; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Hummel for purposes of conducting limited discovery relevant to the scope-of-employment issue, *i.e.*, the Westfall Act certification; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: December 4, 2024
       Albany, New York

Mae A. D'Agostino
U.S. District Judge

19